1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                 FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9   Robert Hackworth,                    )    1:06-CV-773-RCC
                                         )
10               Plaintiff,              )    **ORDER**
                                         )
11  vs.                                  )
                                         )
12                                       )
    G. Torres; et al.,                   )
13                                       )
                 Defendants.             )
14                                       )
                                         )
    _____    )
15

16          Plaintiff Robert Hackworth filed this civil rights action pursuant to 42 U.S.C. § 1983

17  and originally alleged claims of retaliation, excessive force, and various violations of

18  procedural due process. (Doc. 1).  In performing its statutory pre-screening duties, the Court

19  determined that the action should only proceed as to Plaintiff's Eight Amendment claim for

20  excessive force and First Amendment claim for retaliation against Defendants Torres,

21  Morales, Grimsley, and Martinez.  (Doc. 23).  The Defendants filed a Motion for Summary

22  Judgment (Doc. 33) as to Plaintiff's First Amendment claim, and the issue is now fully

23  briefed.  The Court will deny the motion for the reasons discussed below.

24  **I.     Factual Summary**

25          Plaintiff is an inmate in the custody of the California Department of Corrections and

26  Rehabilitation (CDCR) and is currently incarcerated in the California Substance Abuse and

27  Treatment Facility (COR) in Corcoran, California. (Doc. 33-2, ¶ 1).  Plaintiff arrived at COR

28  on July 16, 2003 and was housed in facility 4A.  (Id. at ¶ 2).  He attended his Initial

1  Classification Committee (ICC) approximately two weeks later on July 30, 2003. (Id. at ¶5).

2  During the hearing, Plaintiff took issue with the deadly force policy then in place at COR.

3  (Id. at ¶ 8). Specifically, Plaintiff told the Committee that its deadly force policy was illegal.

4  (Id.  at Ex. A 22:6-22).   Because of Plaintiff's remarks, Defendant Martinez ordered

5  Defendants Morales and CO Cortez to remove Plaintiff from the committee room and escort

6  him back to his cell. (Id. at ¶ 9).

7       As Plaintiff and the two officers approached the door to his housing unit, the door

8  began to open, but Defendant Morales motioned for the door to be closed again. (Id. at Ex.

9  A 26:22-25; Doc. 51, p. 18).[1]  Defendant Morales then faced Plaintiff towards the wall just

10 outside the door. (Id. at ¶ 11 & Ex. A 26:22-25; Doc. 51, p. 18). Defendant Torres arrived

11 to take over for CO Cortez, took hold of Plaintiff's hair, and slammed Plaintiff's face into

12 the door and wall with sufficient force to split it and require two stitches later, saying to

13 Plaintiff, "You think you bad, you MF." (Id. at ¶¶ 12-13 & Ex. A 29:19-25 and 33:9-14;

14 Doc. 51, p. 22 and 31). Plaintiff pushed away from the wall with his knees. (Id. at ¶ 14 &

15 Ex. A 39:5-7). Defendants Morales and Torres then took Plaintiff to the ground. (Id. at Ex.

16 A 40:12-24; Doc. 51, p. 20). Plaintiff moved his torso and kicked his legs while on the

17 ground. (Id. at ¶ 18 & Ex. A 46:7-25). Defendants Morales and Torres kicked and punched

18 Plaintiff and called him names during this time. (Id. at ¶18 & Ex. A 45:1-46:6; Doc. 51, p.

19 18 and 22). Plaintiff told Defendants Morales and Torres that he would file an administrative

20 grievance. (Id. at ¶16).

21      Defendant Grimsley responded to the scene at some point and ordered Plaintiff to stop

22 resisting. (Id. at ¶ 19).   Defendants Torres and Morales were still calling Plaintiff names

23 such as "a gang of MF's, black MF" and "nigger" and taunting him. (Id. at Ex. A 47:7-24).

24 When Plaintiff did not comply with Defendant Grimsley's order, she sprayed a one-second

25

26      [1]Plaintiff testified as to what happened next at his deposition. Defendants do not specifically contradict his
   version of events except that none of them used or witnessed any staff member using unnecessary or unreasonable force,
27 and if they had they would have intervened. (Doc. 33-2, p. 40, ¶¶ 17-18; p. 48, ¶¶ 11 and 17-18; p. 52, ¶¶ 15 and 18-19;
   p. 57, ¶¶ 11-12). Plaintiff offers affidavits of fellow inmates who witnessed the events outside the unit door in support
28 of his version of events

1 | burst of pepper spray into Plaintiff's face from two-and-a-half feet away.  (Id. at ¶ 19 & Ex.

2 | E ¶ 6; Doc. 51, pp. 20 and 22).

3 |     At some point, Defendant Martinez arrived on scene and stepped on Plaintiff's back.

4 | (Id. at ¶ 21 & Ex. A 50:2-4).   As Defendant Torres began to lift Plaintiff, Defendant

5 | Martinez again stepped in the middle of Plaintiff's back and forced him to the ground again.

6 | (Id. at Ex. A, 50:4-6).  He then placed his foot on the side of Plaintiff's head and pressed his

7 | face into the floor.  (Id. at Ex. A 50:6-8).  He ordered an officer in the control room to get a

8 | pair of leg restraints and handed the restraints to Defendant Grimsley.  (Id. at ¶ 22-23).  She

9 | shackled Plaintiff, and Defendant Martinez ordered Defendants Morales and Torres to escort

10 | Plaintiff to the shower for decontamination.   (Id. at ¶ 23 & Ex. B ¶ 10).   After

11 | decontamination, Plaintiff  was escorted outside, stripped, and sprayed with a water hose.

12 | (Id. at ¶ 34 & Ex. A 64:19-21; Doc. 51, p. 20).

13 |     MTA Lemos arrived on scene and examined Plaintiff in the yard.   (Id. at ¶35).

14 | Plaintiff was escorted to the Correctional Treatment Center (CTC) for treatment of his split

15 | lip.  (Id. at ¶ 36; Doc. 51, p. 30-31).  He was given two stitches and pain medications and told

16 | to report back in two days "for the bruises and swelling all over [his] body."  (Id. at Ex. A

17 | 71:11-20; Doc. 51, p. 31).  When he returned to his housing unit his eye and lip were swollen

18 | and he seemed disoriented.  (Doc. 51, p. 25).  He was transported to and from the CTC in a

19 | wheelchair.  (Doc. 33-2, Ex. A 71:6-9; Doc. 51, p. 25).

20 |     All named defendants were employed by the CDCR and worked at COR on the date

21 | in question.  (Id. at ¶ 4).

22 | **II.**     **Motion for Summary Judgment Standard**

23 |     Summary judgment is appropriate when the pleadings and supporting documents,

24 | viewed in the light most favorable to the nonmoving party, show that there is no genuine

25 | issue as to any material fact and that the moving party is entitled to judgment as a matter of

26 | law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit

27 | Union, 24 F.3d 1127, 1130 (9th Cir.1994); Fed.R.Civ.P. 56(a).  Substantive law determines

28 | which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

1    Jesinger, 24 F.3d. at 1130.  In addition, "[o]nly disputes over facts that might affect the

2    outcome of the suit under the governing law will properly preclude the entry of summary

3    judgment."  Anderson, 477 U.S. at 248.  The dispute must be genuine, that is, "the evidence

4    is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

5    The party opposing summary judgment may not rest upon the mere allegations or

6    denials of the party's pleadings, but must set forth specific facts showing that there is a

7    genuine issue for trial.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

8    574, 586-87 (1986); Brinson v. Lind Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995);

9    Fed.R.Civ.P. 56(e)(3).  There is no issue for trial unless there is sufficient evidence favoring

10   the nonmoving party.  If the evidence is merely colorable or is not significantly probative,

11   summary judgment may be granted.  Anderson, 477 U.S. at 249-50.  However, "[t]he

12   evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

13   in his [or her] favor."  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59

14   (1970)).

15   **III.    Retaliation in Violation of the First Amendment**

16   A viable claim of First Amendment retaliation contains five basic elements: (1) an

17   assertion that a state actor took some adverse action against an inmate (2) because of (3) that

18   prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

19   Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not

20   reasonably advance a legitimate correctional goal.  Rhodes v. Robinson, 408 F.3d 559,

21   567-68 (9th Cir. 2005); see also Hines v. Gomez, 108 F.3d 265, 267 (9th Cir. 1997).

22   *A.    Adverse Acts*

23   Defendants concede that "their use of force on Plaintiff during the July 30, 2003,

24   escort constitutes an adverse act." (Doc. 33-1, 7:12-13). Plaintiff's removal from his ICC

25   hearing is also an adverse act.  "The purpose of the ICC was for committee members to

26   determine proper placement of Plaintiff within COR, as well as to explain the regulations and

27   policies of COR to Plaintiff." (Id. at 2:16-17).  Plaintiff's removal from the ICC deprived

28

1 him of his opportunity to participate in the meeting and to have the regulations and policies

2 of the institution fully explained to him; therefore, it was an adverse action.

3      ***B.     Causation***

4      The plaintiff has the burden of demonstrating that his exercise of his First Amendment

5 rights was the but-for cause of defendants' conduct. Mt. Healthy City School Dist. Bd. of

6 Educ. v. Doyle, 429 U.S. 274, 287 (1977); Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310,

7 1314 (9th Cir.1989); Gross v. FBL Fin. Servs., Inc., 129 S.Ct. 2343, 2351 (2009). Timing

8 of the adverse action as well as evidence showing that the action did not further a legitimate

9 penological interest are probative of retaliatory intent. Bruce v. Ylst, 351 F.3d 1283, 1288-

10 89 (9th Cir. 2003). If he meets his burden, "the burden shifts to the defendant to establish

11 that it would have reached the same decision even in the absence of the protected conduct."

12 Sorrano's Gasco, 874 F.2d at 1314.

13      *1.     Timing*

14      In this case, Plaintiff was removed from his ICC hearing and subsequently beaten

15 within minutes of challenging the validity of COR's deadly force policy. This alone may be

16 enough to lead to an inference of retaliatory motive. See McDonald v. Hall, 610 F.2d 16, 17

17 (1st Cir. 1979).

18      Defendants argue that, as to the beating, there is a break in the causal chain, because

19 the officers involved in the beating were not present at the ICC and, therefore, could not have

20 known about Plaintiff's disagreement with the policy. This is inaccurate. Defendant Morales

21 was present at the ICC and when Defendant Torres slammed Plaintiff's face into the wall.

22 The Court is also required to believe Plaintiff's evidence, and Plaintiff testified during his

23 deposition that Defendant Martinez reached for the telephone and called Defendants Torres

24 and Grimsley and the unit office just before he ordered Plaintiff removed from the ICC.

25 (Doc. 33-2, Ex. A 24:5-7). Finally, Defendant Torres admits he knew the reason for

26 Plaintiff's removal from the ICC. (Id. at Ex. C ¶2). Therefore, there is not a break in the

27 causal chain between Plaintiff's comments during the ICC and his subsequent beating, and

28

1   there is a genuine issue of material fact as to what motivated Defendants to slam Plaintiff's

2   face into a wall, take him to the ground, kick him, and call him names.

3       In addition, while Defendants challenge the protected nature of Plaintiff's speech, they

4   do not deny that he was removed from the ICC because of his speech. (Id. at Ex. B   ¶¶ 3-4,

5   and Ex. D ¶ 2).   As discussed below, it is not clear that Plaintiff violated any prison

6   regulation.   Therefore, there is a genuine issue of material fact as to Defendant Martinez's

7   motivation for removing Plaintiff from the ICC.

8                    *2.       Legitimate Penological Interest & Protected Conduct*

9       "A prisoner retains those First Amendment rights that are 'not inconsistent with his

10  status as a prisoner or with the legitimate penological objectives of the corrections system.'"

11  Hargis v. Foster, 312 F.3d 404, 409 (9th Cir. 2002) (quoting Pell v. Procunier, 417 U.S. 817,

12  822 (1974)).

13      The four-factor test set out in Turner v. Safley, 482 U.S. 78, 89-91 (1987), test applies

14  to facial challenges to prison regulations that impact prisoners' First Amendment rights.

15  Plaintiff here does not challenge the prison regulations on their face, but raises an as-applied

16  challenge, which is analyzed under the test set out in Hargis v. Foster.

17      In Hargis, the Ninth Circuit Court of Appeals explained that when a prisoner brings

18  a First Amendment as-applied challenge to a prison regulation, the courts should "examine

19  whether applying the regulation to that speech-whatever its value-was rationally related to

20  the legitimate penological interest asserted by the prison."   312 F.3d at 410.   A prisoner

21  brings an as-applied challenged when he argues that his conduct was not in violation of the

22  prison regulation at issue, and, at the summary judgment stage, the court, viewing the facts

23  in the light most favorable to the prisoner, "must determine whether there is a genuine

24  dispute as to whether [the] statements in fact implicated legitimate security concerns."   Id.

25

26      Defendants argue that Defendant Martinez had a legitimate penological interest in

27  removing him from the ICC, because Plaintiff was "too hot-headed to listen to the

28

1    committee". (Doc. 33-1, 9:9-10).  Defendants claim that Plaintiff was in violation of Title

2    15, CCR, § 3004(b), which states that:

3         Inmates, parolees and employees will not openly display disrespect or
          contempt for others in any manner intended to or reasonably likely to disrupt
4         orderly operations within the institutions or to incite or provoke violence.

5         Defendants cite to Plaintiff's description of the conversation just prior to his removal

6    as evidence of his disorderly behavior.  (Doc. 33-2, Ex. A 22:6-22).  After the committee

7    explained the deadly force policy, Plaintiff questioned the committee, saying, "So you're

8    telling me you're going to shoot me if I ain't even got a weapon in my hand, you'll shoot me?

9    That's against the law."  Defendant Martinez, who was not a committee member, responded,

10   "Well, you're in Corcoran now."    The conversation between Defendant Martinez and

11   Plaintiff continued in this vein until Plaintiff stated the he "didn't give a shit where I'm at,

12   you cannot shoot me legally with a live-round weapon..."  Defendant Martinez "jumped up

13   and put his hand on his OC pepper spray" and again responded that Plaintiff was "in

14   Corcoran."  Plaintiff asked if he was "supposed to be scared", and Defendant Martinez

15   ordered him out of the room.[2]

16        Plaintiff argues that he did not violate § 3004(b) during the ICC, because he did not

17   "become argumentative with Martinez or Committee. Plaintiff asked questions in Committee

18   and stated the facts of the law and Martinez got upset and had Plaintiff removed from

19   Committee." (Doc. 51, 5:16-21).

20        The record of this conversation alone is not enough to demonstrate that Plaintiff was

21   so agitated that he could not participate in the ICC any longer.  Specifically, no committee

22   member asked for Plaintiff's removal, and it was Defendant Martinez who injected himself

23   into the conversation and who made the first physically aggressive movement, by reaching

24

25

26        [2]In their reply brief, Defendants assert that Plaintiff made additional comments as he was leaving the hearing,
     including "threatening the Defendants by stating: 'You better shoot me! It's on now!' and several vulgarities."   (Doc.
27   52, 2:22-25).  The Court declines to consider this evidence and any arguments based on this evidence, because raising
     these issues for the first time in a reply brief is procedurally improper. Miller v. Glenn Miller Productions, Inc., 454 F.3d
28   975, 978 n.1 (9th Cir. 2006); Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996).

1  for his pepper spray.  While Defendant Martinez generally alleges that Plaintiff was "agitated
2  and unruly" he does not provide specific facts supporting this statement.

3      The phrase "in any manner intended to or reasonably likely to" clearly links "openly
4  display disrespect or contempt for others" with " disrupt orderly operations within the
5  institutions or to incite or provoke violence."  Therefore, in order to be in violation of the
6  code, a prisoner must speak both (i) with disrespect or contempt, and (ii) with intent to
7  disrupt or incite/provoke violence or the reasonable likelihood that he will. There is no
8  evidence that Plaintiff's speech was intended to disrupt or provoke violence, or that it was
9  reasonably likely to disrupt or provoke violence.

10      The Court's conclusion is informed by other decisions interpreting the very prison
11  regulation at issue here and its application to various forms of prisoner speech.  The District
12  Court for the Central District of California found a prisoner-plaintiff violated § 3004(b) and
13  was not engaged in protected speech when she complained during a Christmas party about
14  the music in a confrontational and threatening manner to fellow inmates.  Torricellas v.
15  Poole, 954 F.Supp. 1405, 1412-13 (C.D.Cal. 1997).  The Christmas party was held in a
16  waiting room, which was operating at capacity, and the prisoner-plaintiff's complaints upset
17  her fellow inmates enough that several of them complained to prison staff.  Id.

18      The Ninth Circuit Court of Appeals in Brodheim, 584 F.3d at 1271-73, also addressed
19  whether application of § 3004(b) to a prisoner-plaintiff's complaints served a legitimate
20  penological interest. The Court in Brodheim did not rule specifically on whether the prisoner-
21  plaintiff's submission of a written grievance containing disrespectful language[3] aimed at the
22  official responsible for processing his grievance violated § 3004(b).  Rather, the Court held
23  that the link between its interest in peaceable operations and the prisoner-plaintiff's language
24  in the written grievance was too weak to support the conclusion that the written complaint
25  "posed a substantial threat to security and discipline" at the prison.

26

27  [3] The grievance stated, in part, as follows: "You're such a 'stickler' for the rules as you 'see' them. Why not
    teach staff that they are required to respond informally to 602's w/in 10 working days-or is it your position that Title 15
28  applies only 'against' inmates? Or, is it your position that I am not entitled to the information I request? What exactly
    is your position, Mr. Cry-obstruct 602's at all costs? ? ?"

1          Here, Plaintiff's speech was not so offensive as that in <u>Torricellas</u>.  The only people

2   present to hear Plaintiff's words were prison staff, and there is no evidence that Plaintiff

3   threatened prison staff with anything other than litigation, or that he raised his voice or spoke

4   in an aggressive tone.  Rather, the situation was more like that present in <u>Brodheim</u>, because

5   even if Plaintiff's speech were disrespectful, the possibility that his speech would incite

6   violence or disturb the peaceable operations of the prison is so remote that Defendants cannot

7   rely on § 3004(b) to shield them from constitutional scrutiny.

8          Defendants next argue that all of the actions taken to restrain Plaintiff outside of the

9   ICC, except Defendant Torres's slamming Plaintiff's face into the wall, were necessary "to

10   prevent Plaintiff from harming himself or other Correctional staff."  (Doc. 33-1, 9:10-13).

11   While prison officials have an interest in preventing harm to inmates and staff, Defendants'

12   conduct in this case was not reasonably calculated to attain this goal.

13          *C.      Protected Conduct*

14          Defendants argue that since the courts recognize the filing of inmate grievances as one

15   form of protected activity, it must be the only protected activity.  (Doc. 33-1, 7:23-28).

16   Defendants conclude that since Plaintiff did not file any inmate grievances prior to the ICC,

17   he was not engaged in protected conduct.  (<u>Id.</u> at 7:23-26).  This argument is clearly without

18   merit, since courts have recognized many other forms of protected activity.  <u>See</u> <u>Hargis</u>, 312

19   F.3d 404 (making oral request to guard and mentioning court action); <u>Gomez v. Vernon</u>, 255

20   F.3d 1118 (9th Cir. 2001) (acting as law clerks); <u>Vignolo v. Miller</u>, 120 F.3d 1075 (9th Cir.

21   1997) (refusal to sign fiscal agreement).

22          Defendants also argue that "Plaintiff's Claim of a First Amendment right to argue with

23   an Initial Classification Committee over the COR deadly force policy violates CDCR

24   regulations and is not protected conduct."  (Doc. 33-1, 7:28-8:2).  As discussed above, there

25   is a genuine issue of material fact as to whether Plaintiff actually violated § 3004(b).  Even

26   if Plaintiff's words were in violation of § 3004(b), the Court also notes that violation of a

27   legitimate prison regulation is not sufficient to show that Plaintiff was not engaged in

28

- 9 -

1  protected conduct. See Brodheim, 584 F.3d at 1271-73; contra Lockett v. Suardini, 526 F.3d

2  866, 874 (6th Cir. 2008).

3          D.     Injury

4          "[A] retaliation claim may assert an injury no more tangible than a chilling effect on

5  First Amendment rights." Gomez, 255 F.3d at 1127. To show that the prison authorities

6  chilled a plaintiff's exercise of his first amendment rights, a plaintiff need only show that the

7  adverse action taken by the defendant "would chill a person of ordinary firmness from

8  continuing to engage in the protected activity." Blair v. Bethel School Dist., 608 F.3d 540,

9  543 (9th Cir. 2010). A plaintiff is not required to show that he was actually deterred from

10  exercising his rights, Id. at 543 n. 1, and "an objective standard governs the chilling

11  inquiry." Brodheim, 584 F.3d at 1271. Courts have found a chilling effect based on the mere

12  threat of harm. Therefore, removal from an ICC and a subsequent beating would definitely

13  deter "a person of ordinary firmness:" See Brodheim, 584 F.3d at 1271; Gomez, 255 F.3d

14  1127-28. Plaintiff has sufficiently alleged a chilling effect.

15  IV.    Qualified Immunity

16          The qualified immunity analysis is a two-part inquiry. The court must consider

17  whether the facts "[t]aken in the light most favorable to the party asserting the injury . . .

18  show [that] the [defendant's] conduct violated a constitutional right, and the court must

19  determine whether the right was clearly established at the time of the alleged violation.

20  Saucier v. Katz, 533 U.S. 194, 201 (2001). The court is not required to perform the analysis

21  in any particular order. Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818 (2009).

22          Defendants argue only that they are entitled to qualified immunity, because

23  Defendants did not violate Plaintiff's constitutional rights. (Doc. 33-1, 9:26-10:13). As

24  discussed above, there is a genuine issue of material fact regarding whether Defendants did

25  retaliate against Plaintiff because he engaged in speech protected by the First Amendment.

26  Since it is clearly established that retaliation against a prisoner for exercise of his First

27  Amendment rights is prohibited, Brodheim, 584 F.3d 1269, resolving whether Defendants

28  in fact retaliated against Plaintiff is central to determining the qualified immunity issue.

1   Therefore, summary judgment based on qualified immunity is precluded at this stage.

2   Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir. 2003).

3   V.      Conclusion

4           The Court finds that there are genuine issues of material fact as to Plaintiff's First

5   Amendment retaliation claim.  Therefore, summary judgment and a finding of qualified

6   immunity are inappropriate.  Accordingly,

7           **IT IS ORDERED** denying Defendants' Motion for Summary Judgment (Doc. 33).

8           **IT IS FURTHER ORDERED** granting Plaintiff's Motions for Extension of Time

9   (Docs. 47 & 49) and granting Plaintiff's motions requesting a ruling, hearing, and/or status

10  update (Docs. 53 & 54) to the extent that this Order apprises Plaintiff of the status of his

11  action and disposes of all pending motions.

12          DATED this 10th day of May, 2011.

13

14

15  _____

16                      Raner C. Collins
                United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28